### UNITED STATES v. STEFANOWICZ.

### No. 9924.

United States Court of Appeals
Third Circuit.

Argued June 17, 1949.

Decided Oct. 3, 1949.

As Amended Oct. 7, 1949.

Samuel Rose, Philadelphia, Pa., for appellant.

Thomas J. Curtin, Asst. U. S. Atty., Philadelphia, Pa. (Gerald A. Gleeson, U. S. Atty., Philadelphia, Pa., on the brief), for the United States.

Before BIGGS, Chief Judge, and McLAUGHLIN and O'CONNELL, Circuit Judges.

BIGGS, Chief Judge.

Stefanowicz was brought to trial in the United States District Court for the Eastern District of Pennsylvania for alleged violations of the Second War Power Act of 1942, 50 U.S.C.A.Appendix, § 633 et seq. and General Order No. 8 (OPA Rationing Regulations, 8 F.R. 3783). The information contained eleven counts. Counts 1, 3, 5, 7 and 9 charged him with willfully and unlawfully transferring counterfeited sugar stamps to one O'Neill on specified dates during November and December, 1945. Counts 2, 4, 6, 8 and 10 charged Stefanowicz with willfully and unlawfully transferring the same number of stamps having the same value at the same times in a way and for a purpose not permitted by any rationing order. The remaining count charged a sale of sugar on December 14, 1945 at a price higher than the maximum permitted by Price Regulation No. 421, 10 F.R. 1492.

The jury found the defendant guilty on counts 1, 3, 5, 7 and 9 and not guilty on counts 2, 4, 6, 8, 10 and 11. That is to say: Stefanowicz was found guilty in respect to those counts charging willful and unlawful transfer of counterfeited ration stamps but not guilty as to the counts charging the passing of ration currency in an illegal manner or of selling sugar at a price above the ceiling price.

At the appropriate times the defendant moved for a judgment of acquittal and for a new trial basing his motion in part on the contention that the United States had failed to prove the passing of counterfeit stamps at the times alleged and also had failed to prove the defendant's connection with that crime. The trial judge denied the motions. See D.C., 81 F.Supp. 974.

On appeal Stefanowicz contends that the trial judge erred in denying his motion for judgment of acquittal inasmuch as no counterfeited ration documents were presented in evidence as having been transferred or caused to be transferred by him. A brief review of the evidence presented below is therefore necessary.

The pertinent OPA practices were succinctly outlined by a witness who was the former head of the Sugar Division of the OPA for the Philadelphia area. The individual purchased sugar from a retailer by surrendering ration stamps. The retailer attached all the stamps he received to sheets upon which the retailer placed his name as if endorsing a check. These sheets were deposited with the wholesaler who issued in return an equivalent poundage of sugar. The wholesaler deposited the sheets in his rationing bank account from which he could draw checks for sugar from the refinery. The banks sent the ration stamps to a verification center which in turn sent counterfeit stamps back to local OPA offices for investigation.

Swartley testified that he was a former OPA employee trained in detecting counterfeit ration stamps. He said that counterfeit stamps on sheets signed with O'Neill's name had been returned to the Philadelphia office by the OPA verification center.

O'Neill testified that during 1945 he was a retail grocer in Philadelphia and a member of the Richmond Grocery Association of which Stefanowicz was president; that he, O'Neill, purchased sugar stamps from Stefanowicz at certain times in November and December, 1945, which he returned to the Richmond Grocery in the usual manner in return for sugar. O'Neill also identified checks signed by him and made payable to Stefanowicz or to cash, bearing Stefanowicz' endorsements for amounts O'Neill said he paid defendant for stamps. On cross-examination O'Neill was handed 260 counterfeit stamps on sheets which the government had marked as an exhibit for identification. Asked whether these were the same stamps he had gotten from the defendant, O'Neill answered, "I couldn't just identify the stamps, because the stamps all look alike to me but they look like the same stamps." O'Neill was then asked: "Then you can't identify the stamps you got from Mr. Stefanowicz?" He answered, "No, I couldn't say I could identify them." He was next asked: "You don't know whether these are the stamps that you obtained from him?" He replied: "No. I couldn't say that." He also testified that he obtained sugar stamps from two individuals other than the defendant and that he never bought any counterfeit stamps.

It is apparent that there was evidence upon which the jury could base a finding that Stefanowicz illegally sold ration stamps to O'Neill. There was also testimony that O'Neill had negotiated counterfeit ration stamps. The evidence also would have sustained a charge that Stefanowicz knowingly deposited or uttered counterfeit stamps received from O'Neill in the Richmond Grocery Association's account at a bank. The stamps which the defendant sold to O'Neill may or may not have been counterfeit. But no connection was established between the stamps which the defendant illegally sold to O'Neill and the counterfeit stamps which O'Neill had used for the purchase of sugar and which were offered in evidence. The testimony established only that O'Neill had illegally purchased stamps, had unlawfully purchased sugar and had turned counterfeit stamps over to the defendant who endorsing O'Neill's name and writing "Clem"[1] on the sheets to which the stamps were attached, deposited them. As we have stated there was a verdict of not guilty as to those counts which charged improper sale of ration documents. But the verdict of guilty was obtained on counts charging Stefanowicz with transfer of counterfeit stamps. The language of the information used in

---

1. It is probable though it is not clearly established that the word "Clem" on the sheets was also written by Stefanowicz, but even if we assume this to be so it does not aid in proving that Stefanowicz transferred counterfeit stamps to O'Neill. It does indicate that O'Neill transferred counterfeit stamps to Stefanowicz.

these counts charged that the defendant "* * * willfully and unlawfully transferred and caused to be transferred to Gerard O'Neill counterfeited ration documents * * * having reason to believe that the said documents were counterfeited * * *."

There is literally no evidence that the counterfeit stamps offered in evidence or any other counterfeit stamps were transferred by Stefanowicz to O'Neill. Since an essential link is missing, the United States has failed to establish its case as to the only counts on which a verdict of guilty was returned. There is strong probability that Stefanowicz was guilty but the guilt of a defendant must be proved, not merely vehemently suspected in order to sustain a conviction. The cases cited by the learned trial judge in his opinion, 81 F. Supp. at page 975, viz. Petrilli v. United States, 8 Cir., 129 F.2d 101 and United States v. Adelman, 2 Cir., 107 F.2d 497 can, we think, be adequately distinguished.

The other points raised by Stefanowicz are without merit.

The judgment of conviction will be reversed and the cause will be remanded to the District Court with the direction to enter a judgment of acquittal.

O'CONNELL, Circuit Judge (dissenting).

Unquestionably, there was no direct evidence that Stefanowicz transferred counterfeit ration stamps to O'Neill. The failure to attain the ideal in enlightenment, however, should not ipso facto invalidate a conviction. My brethren and I differ on whether there was sufficient evidence from which a jury reasonably could find that Stefanowicz transferred counterfeit sugar ration stamps to O'Neill on November 1, November 7, November 14, November 19, and December 14, 1945. I think

the jury did have adequate basis for its finding.

O'Neill, a retail grocer, testified that he purchased sugar ration stamps from Stefanowicz and subsequently transferred those same stamps to O'Neill's sugar supplier, the Richmond Grocery, of which company Stefanowicz was a principal officer; so Stefanowicz was not only the source but also the outlet for the stamps. Since it was illegal both for Stefanowicz to sell and for O'Neill to buy ration stamps, genuine or counterfeit, it is to be expected that O'Neill would place no identifying mark on the stamps; for O'Neill's very desire was to have the stamps pass as genuine stamps properly obtained, and not to draw attention to them in any way. I think it is fair to say that a person procuring illegally from more than one source anything like ration stamps—or the sugar itself— would probably be unable months thereafter to allocate the items to their illicit origins.

Honoring the precept, then, that the version of evidence to be given credence upon appeal is that which supports the jury finding, I believe the following must be accepted as facts:

(1) O'Neill purchased sugar ration stamps from Stefanowicz, and, not being an expert in such matters, O'Neill could not say whether a ration stamp was genuine or counterfeit.[2]

(2) O'Neill did, however, turn over to the Richmond Grocery, and the Grocery deposited on February 7, 1946, four sheets containing 260 *counterfeit* "39" sugar ration stamps. Each of the sheets bears on its reverse side two notations in Stefanowicz' handwriting: "G. Oneil" [sic] and "Clem."[3]

(3) In the few months following his purchases of stamps from Stefanowicz,

---

2. It may be that O'Neill thought he was being sold genuine stamps because the vendor was a wholesaler in sugar, and therefore a person through whose hands a great many genuine ration stamps would pass. While O'Neill did testify that he never bought counterfeit stamps, I think it is apparent that in abbreviated

form he was asserting that he was not also guilty of engaging knowingly in counterfeit traffic; i. e., he bought stamps, but did not know they were counterfeit.

3. "Clem," of course, is the diminutive of Stefanowicz' Christian name.

O'Neill offered, *and Richmond Grocery accepted,* no less than 26,460 *counterfeit stamps,* although, by Stefanowicz' own testimony, he knew O'Neill was entitled to 1500 pounds of sugar—which means 300 stamps—per week.

(4) Between November, 1945, and May, 1946, when there were about 450 regular purchasers from Stefanowicz' company, O'Neill was sold almost 12% of all the sugar which Stefanowicz' organization received.[4] The November and December invoices rendered O'Neill by the Richmond Grocery were in evidence. They indicate that O'Neill purchased only modest quantities of other commodities for his two retail stores, and also that much of the sugar which Stefanowicz' company sold him was not recorded on those invoices.

(5) Between November 1, 1945, and January 2, 1946, O'Neill drew at least eight checks, totalling $1490, which Stefanowicz cashed personally. On five checks, the payee was Stefanowicz; on the other three, made out to "Cash," Stefanowicz' is the first endorsement. Significantly enough, one of these checks is dated November 1, one November 7, one November 14, one November 19, and two December 14, 1945 —the dates charged in the indictment as being occasions when Stefanowicz sold counterfeit stamps to O'Neill.[5]

(6) When official investigation of O'Neill's activities was imminent, Stefanowicz called O'Neill on the telephone and instructed O'Neill "to destroy all the sugar records I [O'Neill] had."

(7) In the early stages of the government investigation, Stefanowicz advised O'Neill that "the case was fixed and my [O'Neill's] share was $2500."

In view of these facts, I think the jury was warranted in finding that at least some

of the 260 counterfeit sugar ration stamps deposited by Richmond Grocery on February 7, 1946, were stamps which O'Neill had bought from Stefanowicz on the dates charged in the first, third, fifth, seventh, and ninth counts of the indictment.

Perhaps the area of disagreement between the majority of this court and myself lies in our interpretation of the two groups of offenses charged in the indictment. My brethren apparently take the position that the even-numbered counts were directed merely against illegal sale, and the odd-numbered counts (except the eleventh, which charged a third offense and which is hereafter excluded from consideration) further complained of dealing in counterfeit coupons; under such a theory, Stefanowicz technically might have been found guilty on all ten counts. As I read the indictment, however, the jury was asked to ascertain first whether or not Stefanowicz sold sugar ration stamps to O'Neill. If Stefanowicz did, then the second question was whether or not the stamps were genuine; if they were genuine, Stefanowicz was guilty on the even-numbered counts; and if, as the government expert testified, the stamps were counterfeit, Stefanowicz was guilty on the odd-numbered counts. If my analysis be correct, the jury could not have found Stefanowicz guilty on both the even- and odd-numbered counts, unless there also were testimony connecting Stefanowicz with the illicit transfer of *genuine* ration stamps; and no such stamps were introduced into evidence.[6]

If, however, the purport of the holding of the majority of this court is to require that somebody identify counterfeit stamps as originating with the person who first put them into circulation, I think that serious inroads will have been made upon ef-

---

4. The 128,000 pounds of sugar which O'Neill was given was patently far in excess of the 1500 pounds per week he should have received.

5. Stefanowicz, testifying in his own behalf, asserted that as a personal favor to O'Neill he cashed the checks for O'Neill at times when O'Neill needed currency for purchases elsewhere. On the other hand, O'Neill averred that those checks

were in payment for stamps sold him by Stefanowicz on those dates. By its verdict, the jury expressed its belief in O'Neill's account.

6. Unfortunately, the charge of the trial judge in this respect is not too clear. That the district judge did so interpret the indictment and jury findings, however, is indicated by his remarks immediately after the verdict was announced.

fective enforcement of rationing laws of the future. As I have already noted, an intermediate passer of counterfeit stamps —like O'Neill in the case at bar—cannot be expected to mark the counterfeit stamps at the time of his violation, so that months later he may identify any particular stamp and also the source from which he obtained it; nor will every originator of counterfeit stamps confess or testify against himself and thereby enable the government to offer irrefutable evidence of his act. Obviously, punishment of the circulating offender, rather than the original distributor, of counterfeit stamps is a demonstrably ineffective manner of enforcing a rationing law. Consequently, this seems to me one field in which the jury should be allowed its usual scope in weighing circumstantial evidence and drawing appropriate inferences therefrom.

For the foregoing reasons, I believe that an acquittal should not be directed in this case. I do think, however, that there was prejudicial error in the charge of the district judge, in that his comments concerning character testimony failed to meet the minimum standards which we set forth in United States v. Klass, 3 Cir., 1948, 166 F.2d 373. Consequently, even though counsel for Stefanowicz has not pressed this ground for reversal, under all the circumstances I believe the proper action would be a reversal of the judgment and remand of the cause for a new trial.