**Guy R. PEZZNOLA, Plaintiff, Appellant,**

v.

**UNITED STATES of America,**
Appellee (two cases).

Nos. 5060, 5061.

United States Court of Appeals
First Circuit.

May 7, 1956.

Rehearing Denied May 31, 1956.

Reuben Goodman, Boston, Mass. (Paul T. Smith, Manuel Katz and Joseph T. Doyle, Boston, Mass., on the brief), for appellant.

William J. Koen, Asst. U. S. Atty., Boston, Mass. (Anthony Julian, U. S. Atty., and George H. Lewald, Asst. U. S. Atty., Boston, Mass., on the brief), for appellee.

Before MAGRUDER, Chief Judge, and WOODBURY and HARTIGAN, Circuit Judges.

WOODBURY, Circuit Judge.

The defendant was sole proprietor of the enterprise known as Guy's Garage prior to its incorporation as Guy's Super Service Garage, Inc. His first name appears in the corporate title, he was an organizer of the corporation, he was a stockholder, and he was treasurer from its creation through the years here involved. He had access to the corporate records, and he with only Duggan, the president, now deceased, and Mrs. Simansky, the bookkeeper, had access to the cash drawer and the right to take cash therefrom. He signed the incorrect tax returns for the years in question, and in each of those years the net income actually earned by the corporation was over three times the amount of net income reported. He also made some of the sales which were later understated on the corporate books. Perhaps none of these things standing alone would sustain a conviction. Together, however, they seem to me clearly to warrant the conclusion that Pezznola was not a mere mechanic employed by the corporation, or as its treasurer was a mere figurehead, but instead was an active, participating, corporate officer of managerial rank who signed the returns knowing full well that they were false and fraudulent.

Moreover, the above matters provide an illuminating background against which to view Mrs. Simansky's testimony. From the record it is very evident that Mrs. Simansky was not only a reluctant but also an evasive witness. I cannot agree that on the written record her testimony is not susceptible of the interpretation that, although she could not remember in any given transaction whether Duggan or Pezznola directed her to make a false entry, each one of them did so on various occasions. Her reluctance to be specific does not affect this view, for this is not a case of a single isolated incident of falsification which might be lost in the haze of memory. There were nearly eighty falsified transactions on the corporation's books. Her very choice of the alternative method of expression indicates to me that both Pezznola and Duggan were involved. I can hardly believe that she would have even mentioned Pezznola's name, either in the alternative or otherwise, if he had never given her any direction to falsify the corporation's books. Furthermore, even if her involved words when printed are susceptible of differing interpretations, their meaning when uttered, because of their complexity born of her obvious reluctance and evasiveness, depended in unusual degree upon intonation and demeanor observable to the trial judge and jury but not to us.

In this situation I conclude that there was sufficient evidence for the jury to find beyond a reasonable doubt that the defendant wilfully and knowingly at-

tempted to defeat and evade taxes due from Guy's Super Service Garage, Inc.

The judgments of the District Court are affirmed.

MAGRUDER, Chief Judge, concurs.

HARTIGAN, Circuit Judge (dissenting).

These are appeals by the defendant, Guy R. Pezznola, from judgments entered on June 20, 1955, in the United States District Court for the District of Massachusetts which sentenced the defendant in No. 54–195–F to imprisonment for a period of three months and to pay a fine of $2,500, the prison sentence to run concurrently with an identical term imposed upon the defendant in No. 54–236–F.

The two indictments No. 54–195–F and No. 54–236–F charge in substance that the defendant, treasurer of Guy's Super Service Garage, Inc., did wilfully and knowingly attempt to defeat and evade a large part of the taxes due and owing by the corporation to the United States of America for the fiscal years ending on April 30, 1948, and April 30, 1949, respectively, in violation of Section 145(b) of the Internal Revenue Code. 26 U.S.C. § 145. A third indictment, No. 54–237–F, subsequently withdrawn by the trial judge from the consideration of the jury, charged the defendant with the evasion of his personal income tax.

The evidence tended to establish the following facts. The defendant, Guy R. Pezznola, was treasurer and part owner of Guy's Super Service Garage, Inc., a Massachusetts corporation engaged in the sale of new and used automobiles. He transacted some sales in behalf of the corporation, but his chief duties were to serve as body-repairman and mechanic. Thomas G. Duggan, president and likewise part owner of the corporation, was in charge of the office. He did no mechanical work of any kind. Although the defendant had access to the office records, there was no recollection on the part of Mrs. Ethel Simansky, bookkeeper

for the corporation during the years involved, that the defendant had ever actually examined the books.

The tax returns in question were prepared by a firm of accountants. There is no evidence that these returns do not accurately reflect the corporate books and accordingly it follows that any alleged deficiency must be explicable, if at all, in terms of the understatement of business transactions on the records of the corporation itself.

At the conclusion of the Government's evidence the defendant moved for judgments of acquittal, which motions were denied as to No. 54–195–F and No. 54–236–F. The defendant thereupon rested.

Defendant contends that the court below erred in denying these motions, because there was not sufficient evidence of wilful and knowing understatement of taxable income.

We turn, therefore, to a consideration of what evidence there may be in these cases tending to prove that the defendant had knowledge that the corporate books did not properly reflect the business transactions consummated by the corporation throughout the fiscal years ending on April 30, 1948, and April 30, 1949. It is entirely clear that the jury would be completely justified in finding that many of the bookkeeping entries represent substantial and systematic understatements. In this connection the Government relies heavily on the testimony of the bookkeeper, Mrs. Simansky. The Government contends here—and so represented to the jury below—that Mrs. Simansky's testimony was that both the defendant and Duggan had upon occasion instructed her to understate various transactions upon the books. If this contention was well founded, it would, of course, effectively dispose of defendant's claim that there was no evidence in these cases from which the jury could find beyond a reasonable doubt that the defendant had knowledge of the spurious character of the corporate records.

It is apparent that Mrs. Simansky was a reluctant witness. She testified in part:

"Q. And would the entire amount of the receipts from the sale go into that portion of the book, or into the purchase book, or where would it go, the receipts to the company? A. The sale of the car would go into car sales or used car sales.

"Q. Now, my question is when it was entered as a car sale, whether it be new or used, would the entire amount received as a result of that sale be entered in any portion of your books of account? A. I believe it would be entered in the cash receipts.

"Q. In its entire amount? A. If it was paid for all at once, it would be."

Subsequently, after Mrs. Simansky had been questioned regarding particular entries, the Government's examination took the following form.

"Q. Then let me ask you this: if the invoice was for 1750 and you recorded 1350 on sales, where did the other $400 go to?

*    *    *    *    *    *

"The Court: Was it the way you did it? In other words, if you got $1200 for a car, you put it in that book?

"The Witness: Yes.

"Q. As $1200? A. As $1200.

"Q. And that would conform with the invoice and bill of sale if that is what was received, correct? A. Well, it is hard to answer that question after what I have seen.

*    *    *    *    *    *

"Q. On the transaction I was just discussing with you, the sales price was what, according to the invoice? A. I don't remember which one we were discussing.

"The Court: Show her the invoice, please.

(Mr. Koen complied)

"The Witness: Well, in the book I have 1350, and on the bill of sale I have 1750.

"The Court: Then you didn't enter the price of the car as reflected in that bill of sale in the books?

"The Witness: No.

"The Court: Why didn't you do that?

"The Witness: I can't answer. I don't know why I did it.

"Q. Were you told to enter $1350, Miss? A. I don't remember if it was.

"Q. At any time covering any of these transactions were you told to enter a sum other than appeared on the face of the invoice? A. I can't answer that; I don't remember."

After a series of similar questions pointing towards substantial understatements, Mrs. Simansky was questioned as follows:

"Q. All right. Mrs. Symansky, you said in answer to the Court's question it might be money turned back to somebody in the office. Besides yourself and Mr. Pezznola and Mr. Duggan was there anybody else in the office to whom that money might be turned back? A. No, there wasn't.

"Q. Did it go to you? A. No, it didn't.

"Q. Did any of the moneys which have been reflected in the prior invoices and sales go to you? A. No, they never did.

"Q. So they went to either Mr. Pezznola or Mr. Duggan?

"Mr. Smith: I object.

"The Court: Well, if it went to somebody in the office—

"Q. It went to somebody in the office? A. Yes, that's right.

"Q. Did it go to Mr. Pezznola on some occasions? A. I couldn't remember.

"Q. Did it go to Mr. Duggan on some occasions? A. I couldn't remember.

"Q. But if it went to anybody in the office it went to either Mr. Pezz-

nola or Mr. Duggan? A. Yes, that's right.

"Q. And that is true of the transactions that I was asking you about yesterday? A. Yes."

Somewhat later she was questioned concerning an erasure which was observable upon one of the Greenberg documents.

"Q. Fine. In view of the fact it is entered on the slip which Mr. Pezznola made out for $2,000, and in view of the fact the entry in the book is $1500 from sales receipts, can you tell us, if that was erased, at which [sic] instructions you erased it?

"Mr. Smith: I object.

"The Court: It may be put.

"A. I don't remember.

"Did you do it on your own, Miss?

"Mr. Smith: I object, unless there is some evidence.

"The Court: It may be put.

"A. Would you repeat that, please?

"The Court: Did you make that decision to make the erasure?

"The Witness: No, I didn't.

"Q. And who in the organization would give you instructions to make an erasure if such instructions were given? A. It would be either Mr. Duggan or Mr. Pezznola.

"Q. Can you help us as to which of the two gave you specific instruction to make that erasure and change? A. No, I couldn't."

With respect to the Rubenstein transaction her testimony was similar.

"Q. Having in mind the invoice reads $850, Miss, the entry on that, as it now stands, the final entry, is $400; is that correct? A. Yes.

"Q. Have you any memory as to striking out, first, the $100 and striking out the $850, which appear there? A. No, I can't recall.

"Q. Would you have done that on your own, Miss, on your own responsibility? A. No, I wouldn't.

"Q. Who in the corporation would give you instructions with reference to those delineations? A. It would be either Mr. Duggan or Mr. Pezznola.

"Q. Have you any memory, Miss, as to which of the two it was on this occasion? A. No, I don't."

Subsequently, she testified as follows:

"Q. Now, Mrs. Symansky, I will relieve you of that book, if I may. Thank you. We have asked you questions concerning several or many transactions, Miss, where the entry on the sales record is at variance with the amount which appears on the face of the invoice. Correct? A. That is right.

"Q. Now I think you testified earlier that the normal procedure would be to enter in the sales book the amount of the invoice, appearing on the invoice; correct? A. Yes.

"Q. Now, with particular reference to those transactions that we have discussed where the entry in the sales book differs from the amount appearing on the face of the bill of sale or the invoice, did you make those entries which are not in conformity with the amount appearing on the face of the invoice on your own decision? A. No, I did not.

"Q. Did you make them under the instructions of somebody connected with the corporation? A. Yes, I did.

"Q. Can you help us as to the name of *the person* who gave you instructions to record them in the amounts that have been entered in the books? (Italics ours.) A. Yes.

"Q. Who gave you such instructions or directions? A. Mr. Duggan or Mr. Pezznola."

Subsequent cross-examination took the following form:

"X–Q. Now I think Mrs. Simansky, that you testified as to a series of entries that you made upon the books which constitute some seventy or eighty government exhibits, is that correct? A. That's right.

"X–Q. If I am wrong, you correct me. Whether or not the Court asked you on one occasion if you had received instructions from Mr. Pezznola with respect to making that particular entry?

"The Court: I think the District Attorney asked that question. I may have. It makes no difference at all. Now, what is the question?

"The Witness: Well, he did not just say Mr. Pezznola, he asked who and I said it was either Mr. Duggan or Mr. Pezznola.

"X–Q. And then if I remember it you said you could not remember, is that correct? A. That I don't remember.

"X–Q. Did you testify that you could not remember as to whether either one of them have given you a specific instruction, isn't that correct? A. I said either one of them, either Mr. Duggan or Mr. Pezznola.

"X–Q. But you couldn't remember whether it was? A. I couldn't say either one of them."

After a careful review of Mrs. Simansky's testimony I have come to the conclusion that it is not capable of an interpretation which would support the Government in its contention. I believe that Mrs. Simansky's testimony went no farther in substance than this: "The initiative for these understatements must of necessity have come from Pezznola, Duggan, or myself and it did not come from me."

Nowhere in her testimony did Mrs. Simansky make the affirmative assertion that sometimes Pezznola instructed her in these matters and sometimes Duggan. What she did say was that she had no memory as to particular transactions and the Government seizes upon these statements seeking to enlarge them by drawing the inference that she had a more general memory implicating the defendant which was limited only inasmuch as it could not be related to specific transactions. I believe that it is not possible to draw any such inference from her testimony. First of all, on one occasion, she specifically declined to testify that she had any such general memory implicating the defendant.

"Q. Did it go to Mr. Pezznola on some occasions? A. I couldn't remember.

"Q. Did it go to Mr. Duggan on some occasions? A. I couldn't remember."

If the only defect in Mrs. Simansky's memory of these matters related to a mere inability to connect known guilt to specific transactions, she could have indicated as much by an affirmative answer to these questions which in no way called for a memory of individual transactions. This she refused to do.

Still further, I think it is clear from the record that Mrs. Simansky went no farther in the direction of incriminating either the defendant or Duggan than she was forced to go by the undeniable facts and the necessity of exculpating herself from liability for the understatements. After testifying that the entries were properly recorded she was forced by questions directed towards specific entries in the books to acknowledge that they were not properly recorded; but she could not account for the reasons for these discrepancies. She was then forced to admit that only three persons could be responsible, Pezznola, Duggan and herself. Accordingly, she testified it must have been either Pezznola or Duggan because she would not make such entries on her own initiative. This was the limit to which the ammunition in the Government's arsenal could force her to go. In view of the obvious reluctance of the witness, her express refusal to testify at one time that she had a memory which would implicate the defendant "on some occasions," it seems to me clearly impossible to infer that she went

one step farther than the Government could push her and gratuitously added the additional elements of evidence which the Government purports to find in her testimony.

During the trial there was some confusion as to the import of her testimony, but the trial judge seems to have agreed that she had no memory which would implicate either Duggan or the defendant.

"Mr. Koen: Mr. Smith says that there is only one piece of testimony and that was with reference to the $200 from Gallagher or Geller. My memory is that there is another piece of evidence from Steinberg which shows money going into Pezznola in addition. There is this testimony with reference to the books Mrs. Simansky testified here that her directions came both from Pezznola and Duggan on the understatements.

"Mr. Smith: No such thing. She said 'from either.' There is a difference.

"The Court: But she included both, but as to the specific instructions she didn't know which.

"Mr. Smith: She said 'from either one.'

"The Court: That's the same thing.

"Mr. Smith: No. It could have been from either, she said.

"The Court: Tweedle-dum and tweedle-dee. She said it could have been either Pezznola or Duggan, but she couldn't tell which one. Leave it to the jury. I'm not going to be bothered about that."

If this was the true import of her testimony then I believe the trial judge was incorrect in his view that this was a proper matter for jury interpretation. If Mrs. Simansky, as I believe, said no more than this—"It had to be Pezznola, Duggan or I and it wasn't I," then her testimony afforded no evidentiary basis upon which the jury could properly make a determination as to the guilt of the defendant. If left to the jury, such a question could be resolved only by flipping a coin or some other fortuitous device.

In the absence of other evidence tending to prove that the defendant had knowledge of the fraudulent character of the corporate books, I believe this case should not have been submitted to the jury. I have analyzed the record, and with only two exceptions—the Geller and Steinberg transactions—the Government's evidence either shows no connection with the defendant or at best merely that the defendant made certain sales correctly stated on the invoice which were subsequently understated or omitted on the books by some unknown person, either Duggan or himself. Such evidence is clearly inadequate.

Upon analysis the Geller transaction shows nothing to indicate that the invoice was understated, but merely that Geller paid $200 more than he thought the car was worth. Apparently this transaction was subsequently understated on the books, but as in all of these transactions there is nothing to show that the defendant was instrumental in making such understatements.

Steinberg testified that he paid $2325 to the defendant and received a bill of sale "if I were to trust my memory, I would say somewhere in the vicinity of $2000." He was cross-examined as follows:

"X–Q. Do you have to rely upon a record in order to remember? A. Yes, sir.

"X–Q. And so that you would have to rely upon the record in order to remember what the price was on the invoice, is that right? A. Yes, sir.

"X–Q. So that you don't have any independent memory of what the price was on the invoice, do you? A. Not exactly, sir, no, sir.

"X–Q. So that you can't give us your best memory, can you? A. I can give you my best memory.

"X–Q. You can't give us your best memory of who you sold it to? A. I wouldn't begin to try to remember.

"X–Q. Don't you have books and records? A. Yes, sir.

"X–Q. Don't your books and records show the purchase of this automobile? A. It certainly does.

"X–Q. Don't your books and records show the sale of the automobile? A. They certainly do.

"The Court: You didn't bring them with you?

"The Witness: That's right.

"The Court: You have them at home or at the office?

"The Witness: Yes.

"The Court: You can produce them?

"The Witness: Yes, sir.

"The Court: If you want them, Mr. Smith, he will have them.

"X–Q. Well, will you produce them this afternoon? A. Glad to, sir."

The record does not disclose that Steinberg produced his books and records concerning this transaction.

This is the sum and substance of the evidence against the defendant. Under these circumstances I believe the trial judge should have directed judgments of acquittal. In Kassin v. United States, 5 Cir., 1937, 87 F.2d 183, at 184, the court said:

" * * * In each case, however, where the evidence is purely circumstantial, the links in the chain must be clearly proven, and taken together must point not to the possibility or probability, but to the moral certainty of guilt. That is, the inferences which may reasonably be drawn from them as a whole must not only be consistent with guilt, but inconsistent with every reasonable hypothesis of innocence."

It is entirely possible, though not probable, in the light of all the evidence, that Duggan was responsible for every understatement on the books and that the defendant was without knowledge of what was going on. Duggan was dead at the time of the trial. "* * * Since an essential link is missing, the United States has failed to establish its case * * *. There is strong probability that (he) was guilty but the guilt of a defendant must be proved, not merely vehemently suspected in order to sustain a conviction." United States v. Stefanowicz, 3 Cir., 1949, 177 F.2d 189, 191. The evidence in this case is not inconsistent with the possibility that Duggan alone was guilty.

All ambiguity with respect to the testimony of Mrs. Simansky could have been easily cleared up if the Government had seen fit to ask her one simple question: "Without reference to specific transactions, do you have any memory that the defendant ever at any time instructed you to understate the books of the corporation?" Possibly the Government was afraid to ask this question. In any event it did not, but contented itself with an attempt to draw the inference favorable to its case without risking the disaster which would have resulted from a negative response to such a question.

Since the import of Mrs. Simansky's testimony could have been readily clarified in this manner and since the Government neglected to seek any such clarification, I believe that the Government failed to carry its burden of proof and that there was insufficient evidence to take this case to the jury.

Perhaps it should be noted here that at the termination of a seven day trial and after four hours of deliberation, the jury asked the court the following question: "Who is under indictment, Pezznola or Guy's Super Service, Incorporated?"

Nothing that the jury could ask at this late date in the trial could indicate better the jury's utter confusion. The in-

dictment against Pezznola relating to his personal income tax had already been withdrawn by the court from the jury's consideration. Guy's Super Service Garage, Inc. was not under indictment —perhaps it should have been. I am convinced that the jury thought that the corporation should have been indicted and it disregarded the lack of evidence against the defendant in order to reach a compromise verdict based upon its belief that some one ought to pay for the corporation's misdeeds. Pezznola as treasurer was the only target at which to aim since Duggan, the corporation's president, who also signed the tax returns, was dead.

For the foregoing reasons I would reverse the judgments of the district court and remand the cases to that court with direction to enter judgments of acquittal. However, my colleagues are of a different opinion.

### On Petition for Rehearing

WOODBURY, Circuit Judge.

 The appellant has petitioned for rehearing on the ground that his assertions of error in the trial court's charge to the jury must have been overlooked because they were not mentioned anywhere in this court's opinion. This is not so. Judge Hartigan did not have occasion to consider the charge in the view he took of the case and Chief Judge Magruder and I considered the assertions of error only to reject them. One sentence of the charge considered out of context might perhaps be interpreted as an erroneous statement of an applicable principle of law. But considering the sentence in its context, such an interpretation would be so far fetched that we did not think there was any practical probability of misinterpretation by the jury. Furthermore, it does not appear that counsel took exception to the sentence at the conclusion of the charge. Rule 30, Fed.Rules Crim.Proc. 18 U.S. C.A. The charge as a whole impressed us as eminently fair and any possible technical error in it so minor as not to affect substantial rights of the accused. We therefore treated the error, if in fact there was any error at all, as harmless, and disregarded it in accordance with Rule 52(a) of the Federal Rules of Criminal Procedure. Error was also pressed on failure of the court to give a certain requested charge, which, while it contained an abstractly correct proposition of law, was so adequately covered in the general charge as to preclude the possibility of prejudice.

*The petition for rehearing is denied.*