## SHANNON v. UNITED STATES.
### No. 14416.

United States Court of Appeals
Fifth Circuit.

Jan. 15, 1954.

Rehearing Denied Feb. 3, 1954.

James O. Cade, Kenneth Bowlin, Lubbock, Tex., E. T. Miller, Amarillo, Tex., Cade & Bowlin, Lubbock, Tex., for appellant.

Frank B. Potter, U. S. Atty., A. W. Christian, Cavett S. Binion, Asst. U. S. Attys., Fort Worth, Tex., for appellee.

Before HUTCHESON, Chief Judge, and BORAH, and RIVES, Circuit Judges.

BORAH, Circuit Judge.

Appellant, O. L. Shannon, was tried and convicted in the district court by a judge and jury on an indictment drawn under Section 15(c) of the Commodity Credit Corporation Charter Act, Public Law 806, 80th Congress, 62 Stat. 1070, 15 U.S.C.A. § 714m(c). Section 15(c) of the Act provides: "Whoever shall willfully steal, conceal, remove, dispose of, or convert to his own use or to that of another any property owned or held by, or mortgaged or pledged to, the Corporation, shall, upon conviction thereof, be punished by a fine of not more than $10,000 or by imprisonment for not more than five years, or both."

The indictment in this case contained 47 counts, six of which were dismissed by the court on motion of the Government. The jury found the defendant

guilty on the others and the court sentenced him to five years imprisonment on each of counts 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 28, 29, 30, 31, 32, 33, 34, 35, 36, 37, 38, 39, 40, 41, 42, 45, and 46, to run concurrently as to those counts only. It also sentenced defendant to two years imprisonment on each of counts 24, 43, and 47, to run concurrently as to those counts, and ordered that the sentences on the first named 38 counts as a group and the sentences on the last three named counts as a group shall run separately and cumulatively and consecutively. The defendant was also fined $5,000 on each of counts 24, 43, and 47, but the execution of the sentences on said three counts was suspended and defendant was placed on probation for three years to commence after his liability under the above five year sentences on the 38 counts had been lawfully terminated and conditioned upon payment of the fines imposed within a specified period and his exercise of diligent and earnest efforts to make restitution to the Government within the earliest reasonable time. All of the counts charged that the defendant did willfully, knowingly, and unlawfully steal, conceal, remove, dispose of, and convert to his own use a described commodity (wheat or grain sorghum) which was then and there the property of the Commodity Credit Corporation, hereinafter referred to as the C. C. C. In each count the time and place of the particular offense and the quantity of grain were stated.

It affirmatively appears that there were three storage agreements between C. C. C. and appellant and that the latter, doing business as Shannon Elevator, is referred to in the agreements as the warehouseman. The last of these agreements was dated June 1, 1950, under the terms of which the appellant's storage facilities at Sudan, Texas, became subject to a single storage agreement, and all grain of C. C. C. stored in said facilities was deemed to be commingled, and the warehouseman was obligated at his own expense to take all necessary steps to keep it in condition, and to condition any that was deteriorating, to the extent that he had the proper equipment. The agreement also required that the warehouseman "shall at all times maintain in the warehouse indicated on the warehouse receipts and in which the grain was originally deposited for storage a stock of grain of the quantity, class, grade, and quality which he is obligated to deliver under the warehouse receipts"; that the warehouseman "shall upon surrender of warehouse receipts representing the grain stored in such elevator(s) or warehouse(s), when so requested by Commodity, deliver the grain"; and that all the grain accepted by the warehouseman for storage "shall be * * * loaded out and shipped as requested by the owner or other authorized person or agency * * *." There is no question here but that appellant loaded out, shipped, delivered and sold grain stored under the agreement without being "so requested by Commodity * * * or other authorized person or agency * * *."

Appellant contends: (1) That the court erred in denying his motions for judgment of acquittal because (a) the grain described in the indictment was his property under the grain storage agreement and he could not be guilty of a willful theft or conversion thereof and (b) the Government totally failed to produce any physical inventory of appellant's stocks or other tangible evidence of shortage and conversion of the aforesaid grain and (c) there was no showing made by the Government of appellant's intent to steal or convert the grain and there could have been no such intent because appellant had the legal right to sell it to avoid spoilage, and (2) that the court erred in denying a motion for a new trial on the ground of prejudicial and improper statements made by the United States Attorney and his assistant in their arguments to the jury.

Appellant's claim of ownership is bottomed upon the argument that under the grain storage agreement there

was a sale of the grain to the warehouseman and not a bailment. In the recent case of Dawson v. United States, 5 Cir., 203 F.2d 201, 202, this court had occasion to consider a C. C. C. grain storage agreement entered into in the State of Texas and in rejecting a like argument there advanced as wholly untenable we said: "The primary obligation of the warehouseman was to store, insure, load out, and ship, grain at the request of the holder of the warehouse receipts, in whom was the legal title and ownership in common of these commodities"; and that the warehouseman "only held the grain in trust as bailee for the holders of the warehouse receipts." The uncontroverted evidence in this record shows that between 95 and 98 per cent of those receipts were held by C. C. C. and not appellant, and consequently as in the Dawson case we conclude that there was title in the C. C. C. to the commodities described in the indictment.

This brings us to the question as to whether there was evidence of shortage and conversion of the Government owned grain. J. W. Mize, an auditor with the office of Audit, Production and Marketing Administration, United States Department of Agriculture, testified that he took a physical inventory of the amount of grain in store in the Shannon Elevator on August 20 and 21, 1951, and found a shortage of 29,956,190 pounds of grain sorghum and 38,218.80 bushels of wheat. The Government witnesses N. K. Parrish, who was in the grain business at Lubbock, Texas, Harry Hitch, Assistant General Manager of Uhlmann Elevators Company, Fort Worth, Texas, and Hugh E. Corbin, Chief Accountant of Rock Island Grain Company, Fort Worth, Texas, gave evidence of shipments of grain by appellant to their respective businesses and Corbin testified that appellant made further shipments to the Transit Grain Company at Fort Worth. These witnesses identified each shipment by date, car number, quantity and nature of grain shipped, the manner in which it was handled by the consignee, and the point from which shipped which in all instances was Sudan, Texas. P. M. Miller, Administrative Officer of the Production and Marketing Administration Commodity Office at Dallas, Texas, testified that C. C. C. ordered grain out of warehouses by means of loading orders and that his office is the only one which can give loading orders for grain stored in the State of Texas and owned by C. C. C. That no order of any kind was ever issued to Shannon Elevator to load out such grain to Parrish or to Uhlmann Elevators Company, or to Transit Grain Company, and that with one single exception not here pertinent no such order was issued to load out to Rock Island Grain Company. He further testified that C. C. C. ordered out all of its grain which was stored with Shannon Elevator, but the orders were not completely filled. John J. Bachmann, Chief of Accounting Investigations in the Department of Agriculture, testified that he was in charge of the accounting investigation of the records and books of the Shannon Elevator for the years 1949, 1950, and 1951, particularly with respect to appellant's transactions in grain sorghum and wheat, and that appellant was never in a long position at any time after October 15, 1949. He stated, as of the date of each of the undismissed counts, what percentage of the grain in storage in appellant's facilities belonged to C. C. C., and applying such percentages to the shipments established by the witnesses Parrish, Hitch, and Corbin, he stated the amount of grain in each shipment which was owned by C. C. C. The appellant, a witness in his own behalf, admitted that he was materially short, that he failed to deliver to C. C. C. all the grain for which it held warehouse receipts, and that he loaded out, shipped, and sold [1] grain to the aforementioned

1. Appellant gave this testimony:
   "Q. I will ask you if you said this in that statement: Following is a list of persons or concerns to whom I have sold Commodity Credit grain. They bought the bulk of this grain. There are others whose names I am unable to furnish. N. K. Parrish, broker, Lubbock,

dealers and others. This disposes of the question of shortage.

■ The appellant next contends that the Government did not discharge its burden of proving that he "willfully" converted the grain. We think this issue was properly submitted to the jury under appropriate instructions and that there was evidence sufficient to convince a fair minded jury beyond a reasonable doubt that the requisite criminal intent was present. For example, appellant was unable to deny that on or about August 9, 1951, he certified to C. C. C. that he had a correct and just claim in the sum of $41,111.17 for storage charges on 35,675,682 pounds of grain "on store", but that C. C. C. refused payment because its representatives "had been out there and couldn't get their grain." This evidence of an ineffectual attempt by appellant to conceal his activities is consistent with the testimony of the Government auditor Mize [2] that appellant attempted to forestall the Government from measuring his inventory because of knowledge on his part that he had sold the grain and applied the proceeds to his own use. The facts of the case thus carry with them convincing evidence of the willful doing of the things which constitute the crimes charged. It follows that appellant's claim that he had a right to sell the grain "to prevent further spoilage" is a false issue which we need not labor here.

We have carefully considered appellant's contention that his motion for new trial should have been granted because of improper statements made by the United States Attorney and his assistant in their arguments to the jury. These statements, strictly speaking, overstepped the bounds. It is quite another thing to say that these statements constitute prejudicial error. In the first place, this was not a weak case and it is hard for us to imagine that the minds of the jurors would be so influenced by such incidental statements during this long trial that they would not appraise the evidence objectively and dispassionately. In the second place, it does not appear that the court was requested to rebuke counsel or to charge the jury to disregard his remarks, both of which are usually considered proper practice in laying a predicate for an assignment of error.

On the whole case, it cannot be said that any substantial rights of the parties were affected by acts of the court and of counsel for the Government. 28 U.S.C.A. § 2111; Fed.Rules Crim.Proc. rule 52(a), 18 U.S.C.A.; Meyer v. U. S., 7 Cir., 258 F. 212; Hunter v. U. S., 5 Cir., 264 F. 831; Billinglsey v. U. S., 6 Cir., 274 F. 86.

Since we find no prejudicial error in the record the judgment is affirmed.

---

Texas. Transit Grain Company, Fort Worth, Texas; Rock Island Grain Company, Fort Worth, Texas. Uhlmann Elevators, Fort Worth, Texas. Sudan Livestock & Feeding Company, Sudan, Texas. Robstown Farm Commodities, Inc., Robstown, Texas. A. Well, I did sell them grain that I had stored for Commodity Credit."

2. Mize testified:
"Well, at that time he told me that he was short of grain and that he wondered if it wouldn't be possible for me to forget about measuring his inventory at that time and of course come back at a later date, * * *."
*      *      *      *      *      *

"Well, * * * it's a policy of our office after any time of audit, * * * to discuss the finding with the contractor, or in this case Mr. Shannon, and of course I pointed out to him the quantity of shortage which I determined, and of course he stated there that, he told me that the sales proceeds had gone into the warehouse construction and at the present time he would be unable to replace that shortage. He also stated that he contemplated at harvest time he would be able to acquire something like 15 million pounds of milo, and that with some time he could possibly clear himself of this condition, which was the shortage."