Francis M. ELMORE, Appellant,

v.

UNITED STATES of America,
Appellee.

No. 7657.

United States Court of Appeals
Fourth Circuit.

Argued April 6, 1959.

Decided May 28, 1959.

John L. Nettles, Florence, S. C., and James P. Mozingo, III, Darlington, S. C., for appellant.

Arthur G. Howe, Asst. U. S. Atty., Charleston, S. C. (N. Welch Morrisette, Jr., U. S. Atty., Columbia, S. C., on brief), for appellee.

Before SOBELOFF, Chief Judge, and SOPER and HAYNSWORTH, Circuit Judges.

SOPER, Circuit Judge.

This appeal is taken from a judgment of the District Court whereby the defendant, Francis M. Elmore, was sentenced to a term of 18 months imprisonment after a verdict of guilty on certain counts in an indictment of thirty counts, wherein he was charged with violating certain criminal provisions of the Commodity Credit Corporation Act passed for the protection of the operations of the Commodity Credit Corporation in the distribution of farm commodities and farm products in the relief of disaster areas found to exist by the President of the United States.

The indictment outlines the statutory provisions and executive orders under which the relief of major disasters in the United States was made available. A chain of authority was established, running from the President through the Federal Civil Defense Administrator and the Secretary of Agriculture, whereby the existence of a major disaster should be determined, and the distribution of feed for livestock to farmers, ranchers and stockmen should be authorized. The Farmers Home Administration was charged with the responsibility for determining the eligibility of applicants for emergency livestock feed, and the Commodity Credit Corporation was authorized to make available any farm com-

modity or product thereof and to issue regulations establishing the procedure under which applicants could receive surplus feed grains or approved mixed feed owned or controlled by it. See 42 U.S. C.A. §§ 1855–1855g, 18 F.R. 407, 18 F.R. 4609, 7 U.S.C.A. § 1427, 19 F.R. 5199–5201, 5466–5468.

Under these authorities and regulations it was necessary for an applicant for assistance first to make application to his County Committee of the Farmers Home Administration and upon approval of his application, his County Agricultural Stabilization and Conservation Committee issued a Farmers' Purchase Order for Grain for Livestock Feed, which the applicant could present to a dealer in grain who, upon acceptance, was required to complete a table on the order form showing the quantities of surplus feed grains, or approved mixed feeds, delivered to the applicant. The dealer was also required to certify on the Purchase Order form that he had sold and delivered to the named farmer the grain or mixed feed shown on the table. After the acceptance of the Purchase Order and delivery of the grain, in accordance with the certificate, the dealer could present the Purchase Order within one hundred twenty (120) days to the County Agricultural Stabilization and Conservation Committee and receive in exchange a negotiable certificate which the Commodity Credit Corporation would accept at face value if presented within one hundred twenty (120) days after issuance. In conformity with this procedure the President of the United States, on September 16, 1954, determined that a major disaster existed in South Carolina and, on September 22, 1954, the Secretary of Agriculture determined that all the counties in the State were affected by the disaster.

The first count of the indictment charged that thereafter, on November 26, 1954, the defendant for the purpose of influencing the action of the Commodity Credit Corporation and obtaining something of value from the Corporation unlawfully made false statements and representations on a Farmer's Purchase Order for grain and livestock feed, knowing the statements and representations to be false, in that the defendant unlawfully certified on a Purchase Order issued to a certain Mack McKenzie, that Elmore Milling Company had delivered 25 cwt. of surplus feed grain to McKenzie, when in truth the grain had not been so delivered. This count of the indictment was based on 15 U.S.C.A. § 714m (a), which provides that whoever makes any statement knowing it to be false for the purpose of influencing the action of the Commodity Credit Corporation, under the provisions of the Commodity Credit Corporation Act, shall be punished by a fine of not more than $10,000 or by imprisonment of not more than five years or both. Counts 2 to 11 of the indictment charged similar offenses on various dates in 1954 and 1955. The defendant was found guilty on counts 1, 2, 6, 7, 9 and 11 and acquitted on the rest of the counts in this category.

Counts 12 to 28 of the indictment charged that the defendant on various dates between May 25 and June 22, 1954, did willfully steal, remove, dispose of and convert to his own use or to the use of the Elmore Milling Company, a copartnership, various quantities of wheat of the Commodity Credit Corporation then in storage at South Carolina State Warehouse No. 1227–G of the Eastern Farmers Cooperative Association. These counts were based on 15 U.S.C.A. § 714m(c), which makes such actions punishable by a fine of not more than $10,000 or imprisonment for not more than five years or both. The defendant was found guilty on all of the counts in this category.

Count 31 of the indictment charged that the defendant, on July 13, 1954, for the purpose of obtaining 4200 bushels of wheat at a discount price made false statements, knowing them to be false, in a wheat certificate submitted by him on behalf of Elmore Milling Company to the Commodity Credit Corporation in that he certified that the wheat would be used for livestock and poultry feed and that a

similar certificate would be obtained from subsequent buyers in the event the wheat was resold. This count was based on 15 U.S.C.A. § 714m(a). The defendant was convicted on this count.

Count 32 of the indictment charged that Francis M. Elmore, the defendant named in the foregoing counts, and Thomas H. Elmore conspired to violate 15 U.S.C.A. § 714m(d) in that the defendants for the purpose of influencing the action of the Commodity Credit Corporation and obtaining for themselves or Elmore Milling Company something of value, did knowingly make false statements to the Corporation, to the effect that wheat purchased by them from the Corporation would be used as feed for livestock or poultry and that if the wheat were sold a similar certificate would be obtained from the purchaser. Both defendants were convicted on this count; but Thomas H. Elmore was released on probation and has not appealed.

Certain facts are not in dispute. Francis M. Elmore, the defendant-appellant, was the manager of a State-operated grain storage warehouse in Florence, South Carolina, owned by the Eastern Carolina Farmers Cooperative Association. He was also the manager of the Elmore Milling Company, a partnership consisting of his wife and sister, which dealt in feed. Thomas Elmore, his brother, the codefendant in the conspiracy count, was engaged in the trucking business as manager for one James Poplin during May, June and July 1954, hauling grain and other merchandise.

The warehouse in the ordinary course of business issued warehouse receipts to the owners of the grain on storage from which it kept a daily record or inventory showing the amount of grain in the warehouse. Owners were required to produce the receipts for cancellation upon withdrawal. During the years 1953 and 1954 the Commodity Credit Corporation stored grain in the warehouse under agreements with the Cooperative Association, executed by the defendant as manager, which provided that the warehouse would receive for storage grain of the C.C.C. to be commingled with other grain and that the Association would at all times maintain in the warehouse a stock of grain equal in quantity and quality to the grain which it was obliged to deliver under its outstanding warehouse receipts. The agreements further provided that the warehouse would deliver grain belonging to the C.C.C. as it directed, upon the surrender of the receipts, and that the warehouse would pay the difference between the value of the commingled grain loaded out and the grain called for in the loading orders.

In 1955 the C.C.C. forwarded orders to the warehouse for delivery of wheat and after partial delivery, lacking 12,220 bushels, had been made, the warehouse was found to be empty. This led to an investigation and disclosed information upon which counts 12 to 28 of the indictment, now to be considered, were based. The loss to the Government was made up by assessing the farmers who owned the Cooperative Association.

The investigation covered the period from June 1951, when operations of the storage warehouse began, to May 1955. Calculations based on the records of receipts and disbursements showed that on May 25, 1954, the amount of grain on storage was 4,051,629 pounds. An examination of the outstanding warehouse receipts as of this date showed that the C.C.C. was the owner or pledgee of 4,756,441 pounds of grain, or 704,812 more pounds than were in the warehouse at the time. During the period from May 25, 1954 to June 22, 1954, the transactions occurred which formed the basis of counts 12 to 28 of the indictment. The defendant caused seventeen shipments of grain in varying amounts, totaling 933,596 pounds or 15,559.93 bushels, to be withdrawn from the warehouse and sold in the name of Elmore Milling Company to various flour mills in South Carolina. The purchasers made payment therefor to the milling company and their checks were deposited to its credit in its bank-

ing account. These withdrawals were made without the production of warehouse receipts for cancellation contrary to the agreements between the C.C.C. and the Cooperative Association and contrary to the official regulations governing the State warehouse system. Accordingly, the withdrawals did not show on the daily inventory of the warehouse. Separate records of these withdrawals were, however, made by the Secretary of the Association, contrary to the usual procedure, upon the instruction of the defendant.

Shortly after the withdrawals began and payments for the grain were made by the purchasers to the Elmore Milling Company, the defendant began to purchase wheat to take the place of that which he had withdrawn. In June 1954, he purchased from farmers three loads of grain in the aggregate amount of 5325.24 bushels at $2.00 per bushel. In the same month he purchased at a discount from the C.C.C. in the name of Elmore Milling Company 18,000 bushels of wheat at $1.67 per bushel which the C.C.C. desired to dispose of as surplus wheat, to be used, however, only for livestock and poultry feed.

The defendant testified that the purpose of these transactions was to earn a profit for the warehouse and that this purpose was achieved. According to his testimony an average profit of 12-cents a bushel was made on the withdrawal of the grain from the warehouse and the replacement of grain purchased from farmers, and a profit of $2673.80 was made on the 18,000 bushels of grain purchased from the C.C.C., and all of the profit on the farmers' grain was turned over to the warehouse while the profit on the C.C.C. was divided—one-third to the warehouse and two-thirds to himself. He admitted that the withdrawals were contrary to the regulations but said they were made with the approval of the president of the Association, who was dead at the time of the trial. Testimony on the part of the Government, on the other hand, tended strongly to show that none of the profit came into the hands of the Cooperative but that all of it went to him or the Elmore Milling Company in which he was interested. The money derived from the sale of the grain was traced to the bank account of the milling company and, according to the secretary-bookkeeper of the warehouse, no profit was made by it or recorded on its books. Indeed it was shown that the standard warehouse charges for services rendered in the withdrawal and deposited grain were not paid. Furthermore, from the fact that the C.C.C. grain was purchased at a discount, the jury might fairly have inferred that the profits derived from its sale were greater than the defendant testified.

The principal contention of the defendant with regard to counts 12 to 28 of the indictment is directed to the judge's charge as to the meaning of the statute set forth in 15 U.S.C.A. § 714m, which makes it a criminal offense for anyone to willfully steal or convert to his use or that of another any property owned or pledged to the Commodity Credit Corporation. In effect, the judge charged the jury that the word "steal" as used in the statute is not confined to the technical crime of common larceny but includes all felonious taking of wheat with intent to deprive the owner of possession and the rights and benefits of ownership.

The judge also charged the jury that conversion may be consummated where the initial possession of the converter is entirely lawful and that wheat rightfully taken into one's custody may be converted without any intent to keep or embezzle merely by commingling it with the custodian's own, if he is under a duty to keep it separate and intact. However the judge went on to say that in enacting the statute Congress did not intend to eliminate intent from the offense; that in order to violate the statute there must have been an intent to violate the law; and that where the taking is open and there is no attempt to conceal, a strong presumption arises that there is no felonious intent, which pre-

sumption must be repelled by clear and convincing evidence before a conviction is authorized and, therefore, the question of what the defendant intended in this case by his actions was a question of fact to be determined by the jury under all the facts and circumstances of the case.

The judge further charged that if the jury found that wheat belonging to the Commodity Credit Corporation was removed from the warehouse by the defendant without authority and with intent to convert it either temporarily or permanently to his use or to that of the Cooperative Association, then the defendant was guilty under counts 12 to 28, whether or not a profit was made either for him, the Elmore Milling Company, or the warehouse, and whether or not the wheat taken out of the warehouse was replaced.

The specific objections which the defendant makes to this charge are:

(1) Since the commingling of the wheat in the warehouse was entirely lawful it was irrelevant to charge the jury that wheat rightfully taken into custody may be converted without any intent to keep or embezzle it by commingling it with the custodian's own if he was under a duty to keep it separate and distinct;

(2) The jury were likely to be confused by the statements that an intent to keep or embezzle under such circumstances is immaterial, followed by the statement that a criminal intent to violate the law was necessary to conviction in the pending case;

(3) The statement that it was immaterial whether or not the wheat taken out was replaced or not replaced was harmful and should have been coupled with the affirmative statement, requested by the defendant, that the jury had the right to consider the return of the property in connection with the question of intent.

We do not think that the defendant was prejudiced by the statements contained in the charge in the setting under which it was delivered. The broad scope given to the word "steal", was a correct interpretation and was in harmony with the ruling in United States v. Turley, 352 U.S. 407, 77 S.Ct. 397, 1 L.Ed.2d 430, that the word "stolen" has no accepted common law meaning and as used in the National Motor Vehicles Act is not limited to takings which amount to larceny but includes all takings with criminal intent to deprive the owner of the rights and benefits of ownership. The definition of "conversion" in the charge was likewise correct. It was taken almost literally from Morissette v. United States, 342 U.S. 246, 271–272, 72 S.Ct. 240, 96 L.Ed. 288, where it was held, notwithstanding the breadth of meaning to be given to the term, that a criminal intent is an essential element of the offense of converting public property to one's own use in violation of 18 U.S.C. § 641.

The reference in the charge to a possible offense by the commingling of grain with the custodian's own without an intent to embezzle, if it was the duty of the custodian to keep the deposits separate, could have done the defendant no harm because it was made perfectly clear to the jury that in this case the grain was properly commingled and that the obligation of the warehouse was fulfilled if it produced upon demand grain of the same kind and quality as that deposited by the owner. Nor could the jury possibly have inferred, in view of the positive statements in the charge, that they were at liberty to convict the defendant even if he had no wrongful intent. The technical objections now raised by the defendant are especially lacking in weight and substance, in view of the undisputed evidence and the admissions of the defendant, which clearly establish the fact that he made use of the Corporation's grain in order that he might make a profit for himself and for the warehouse that he managed. It was

therefore proved beyond any reasonable doubt not only that the defendant withdrew the wheat illegally and in breach of contract without the production of warehouse receipts, but also that he withdrew it with the specific intent to appropriate it to his own use and benefit. Under these circumstances it becomes the duty of the court to ignore technical objections to portions of the charge that could in no way have interfered with the jury in arriving at their verdict. 28 U.S.C. § 2111; Rule 52(a), Fed.Rules of Crim.Procedure, 18 U.S.C.; Kotteakos v. United States, 328 U.S. 750, 757–761, 66 S.Ct. 1239, 90 L.Ed. 1557; Pezznola v. United States, 1 Cir., 232 F.2d 907, 915, certiorari denied 352 U.S. 834, 77 S.Ct. 53, 1 L.Ed.2d 54.

These observations go far to dispose of the sweeping contention that the judge should have directed a verdict for the defendant on counts 12 to 28 because, in the absence of an intention to convert, there can be no conversion of fungible grain by its lawful custodian where he is able to produce it on demand. In support of this contention it is said that there was a total lack of any evidence of an intent on the part of the defendant to convert to his own use. It must be borne in mind that the charge against the defendant in the present case is not based on his ability or failure to produce on demand the grain for which the C.C.C. held warehouse receipts, although the evidence does show that such a failure took place in 1955. The present case is based on the charge that the defendant, having lawful custody of the grain, made use of it as if it were his own and the charge was sustained by proof that he actually withdrew grain of the C.C.C. without the production of warehouse receipts, sold it at a profit and replaced it with grain which he had bought from the C.C.C. at a discount, for restricted use, and sold without restriction in violation of his contract with the

Corporation. We are at a loss to understand, in view of these facts, the contention that there was no evidence that the defendant intended to convert the wheat, unless it is meant that it was his intention to replace it after he had used it for his own purposes. But neither the intention to replace nor the actual replacement is a defense when conversion is proved.[1] The criminal sanction of the statute is imposed to prohibit the unlawful use of another's property, and the statute does not permit the converter to subject the owner to the risk of loss and relieve the converter of criminal liability if his operations are successful and he makes restitution.

In Hartford Accident Indemnity Co. v. State of Kansas ex rel. Fatzer for Benefit of Meitl, 10 Cir., 247 F.2d 315, upon which the defendant relies, the court was concerned with the contractual obligations owed by the custodian to the owner of the wheat, and in saying (page 321) that there can be no conversion until demand for delivery has been dishonored, the court was referring to contractual and not to criminal liability. We need not here inquire into the correctness of this decision. See Harper & James, Law of Torts, §§ 2.17, 2.27; 56 Am.Jur., Warehouses, § 191. The more pertinent cases in which the courts found criminal conversion of property to exist under varying circumstances in violation of the statute now under consideration are Dawson v. United States, 5 Cir., 203 F.2d 201; Shannon v. United States, 5 Cir., 209 F.2d 835; Henderson v. United States, 5 Cir., 203 F.2d 81; Marteney v. United States, 10 Cir., 218 F.2d 258.

### Counts 29, 30, 31 and 32

These counts of the indictment were based on activities of the appellant-defendant, Francis M. Elmore, and his brother, Thomas H. Elmore, in the acquisition of surplus feed wheat from

---

[1] Rakes v. United States, 4 Cir., 169 F. 2d 739, 743; Dobbins v. United States, 81 U.S.App.D.C. 218, 157 F.2d 257, 259, certiorari denied 329 U.S. 734, 67 S.Ct. 99, 91 L.Ed. 634; Hancey v. United States, 10 Cir., 108 F.2d 835, 837.

the C.C.C. and the execution of various certificates as to its intended use. The first incident occurred with respect to the purchase of 18,000 bushels from the C.C.C. above mentioned, which were used in part to replace the wheat illegally withdrawn from the warehouse. On June 15, 1954, an employee of the Department of Agriculture informed Francis Elmore that the C.C.C. had 12,000 bushels of No. 4 wheat and 6000 bushels of No. 5 wheat at Darlington, South Carolina, which it desired to sell at a minimum of $1.61 per bushel on a restricted basis in order to create more storage space. The restriction was that the wheat could be used only as feed for livestock or poultry. Shortly thereafter Thomas H. Elmore, the defendant's brother, submitted a written bid on behalf of Elmore Milling Company of $1.67 per bushel, which was accepted. In order to secure the wheat he executed two certificates signed by him in the name of the milling company to the effect that the wheat would be used only as feed for livestock or poultry and that if it were sold to another person a similar certificate as to its use would be obtained. The certificate also stated that the signer understood that the price charged was based on restricted use and that its use otherwise would impair the Government price support programs, and that if the signer permitted any other use of the commodity he would pay the C.C.C. a price adjustment of $1.07 per bushel on the 12,000 bushels and $1.04 per bushel on the 6000 bushels. Notwithstanding these promises, the wheat was hauled to the Cooperative warehouse and commingled with the wheat on storage and disposed of, under the direction of Francis M. Elmore, without restriction as to its use. Because of the false certificates given in these transactions Thomas H. Elmore was indicted in counts 29 and 30 for violation of 15 U.S.C.A. § 714m(a). Thomas Elmore's defense was that he had learned of the availability of this wheat from another representative of the Government when he called to see him in connection with the hauling business and that he made the bid and bought the wheat in the name of Elmore Milling Company without his brother's knowledge and had it hauled to the warehouse and that he signed the certificates without reading them. The jury convicted Thomas H. Elmore on these two counts.

Count 31 of the indictment charges a similar violation of § 714m(a) by Francis M. Elmore with respect to the purchase of 4200 bushels of Government wheat at $1.75 per bushel on July 13, 1954, upon a similar restriction and the execution of a similar certificate by him. This wheat was held by the Government in storage on farms in Calhoun County, South Carolina, and the evidence indicates that after the purchase he sold and delivered it without restriction at $2.25 per bushel to the Statesville Flour Mills Company at Statesville, North Carolina.

The defendant's statements in respect to this transaction were conflicting. At one time, in statements to Government representatives, he corroborated the above account, but afterwards he testified that he sold the wheat to one James M. Poplin, who was in the milling business and the trucking business and employed Thomas H. Elmore in the latter, and that Poplin gave him a certificate of restricted use which was later lost in a fire. Poplin was a witness for the Government in respect to the Darlington wheat but he was not questioned by the defendant as to the purchase of Calhoun County wheat. Obviously there was sufficient evidence to justify the submission of this charge to the jury and they found a verdict against the defendant.

The defendant contends, notwithstanding the conflict in the evidence, that the jury should have been instructed to find a verdict for him on count 31 on the ground that the crime of making a false statement for the purpose of influencing in any way the action of the Corporation or for the purpose of obtaining for himself or another money, property or anything of value is confined to false

statements of existing fact. Since the statements by the defendant in regard to the 4200 bushels of wheat purchased by him from the C.C.C. on July 13, 1954, were not statements of fact but promises as to the future use of the commodity, it is said that he committed no crime. The argument is based on the decision in Chaplin v. United States, 81 U.S.App. D.C. 80, 157 F.2d 697,[2] that under the statutory crime of obtaining money or things of value by false pretenses the statements must relate to existing facts and not to future transactions, the theory being that otherwise there would be danger that debtors unable to meet their obligations would be prosecuted for the commission of crime. It is said that if Congress had intended to make false promises as to the future a criminal offense under 15 U.S.C.A. § 714m(a), it would have made express provision therefor as it did in 18 U.S.C. § 1341, which makes it a crime to use the United States mails for the purpose of executing a scheme to obtain money or property by false or fraudulent pretenses, representations or promises.

■■ In our opinion the statute, 15 U.S.C.A. § 714m(a), should be interpreted to mean not only false statements of existing fact but also false and fraudulent promises which the maker does not intend to perform. It was the stated purpose of the Commodity Credit Corporation Charter Act, 15 U.S.C.A. §§ 714–714o, to stabilize and support farm income and prices and the Corporation was given specific powers to support the prices of agricultural commodities by loans and purchases and also to dispose of surplus agricultural commodities. The criminal offenses defined in § 714m were evidently designed to protect the Corporation in the performance of its duty. In the exercise of its authority, it was necessary for the Corporation to impose restrictions upon the use of surplus commodities and to receive assurances from dealers through whom the commodities were disposed of that the distribution would be made in such a way as not to frustrate the purposes of the plan. Bearing these circumstances in mind it cannot be supposed that Congress intended to direct the criminal sanctions of the act only against those who make false statements of existing fact and to exculpate those who should obtain surplus commodities by making false promises which they do not intend to fulfill. In practical effect, a false promise fraudulently given amounts to a false statement of an existing intent and it can be as destructive as the false statement of a material fact. We think that Congress intended to cover it by the statute.

Similar situations have been met in the execution of other federal statutes and similar interpretations have been made. Thus, it was held in United States v. Rubinstein, 2 Cir., 166 F.2d 249, that it was an offense under the Selective Training and Service Act of 1940 for a draftee to make false statements as to his liability for service even if the statements were merely expressions of opinion as to future matters if belief in their truth were not honestly entertained. The court pointed out (page 255) that the statements were to be used to enable men to be selected for military service with regard to the needs of their dependents, employers and the public and that in order to enable the Government to perform a task of this magnitude, Congress made it a crime to furnish false statements to the draft boards, whether they pertained to the past, present or future.

Similarly in United States v. Kreidler, D.C.S.D.Iowa, 11 F.Supp. 402, it was held to be a criminal offense under the Home Owners' Loan Corporation Act, 12 U.S.C.A. § 1467(a), to make a false statement to influence the actions of the Home Owners' Loan Corporation, whether the statement was merely promissory or a statement of existing fact. In Todorow v. United States, 9 Cir., 173 F.2d 439,

---

**2.** See the discussion of this case in 168 A.L.R. 833.

certiorari denied 337 U.S. 925, 69 S.Ct. 1169, 93 L.Ed. 1733, it was held that the false statements of a veteran in an application to purchase surplus army trucks as to the future use of the trucks were violations of the False Claims Act, 18 U.S.C. § 1001, which makes it a crime for anyone in a matter in the jurisdiction of any agency of the United States to make any false, fictitious or fraudulent statement. The same rule was followed in Corcoran v. United States, 5 Cir., 229 F.2d 295, 299; United States v. Grayson, 2 Cir., 166 F.2d 863, 866. See also McCoy v. United States, 9 Cir., 169 F.2d 776; United States v. Lurie, 7 Cir., 222 F.2d 11.

■ Count 32 of the indictment charged that Francis M. Elmore and Thomas H. Elmore violated § 714m(d) by conspiring with one another to violate § 714m(a) by making false statements in the feed certificates presented to the C.C.C. that the wheat purchased by them from the Corporation would be used as feed for livestock and poultry knowing that the statements were false. The evidence in support of counts 29 and 30 with respect to the bid and certificates by Thomas H. Elmore in the purchase of the 18,000 bushels of wheat from C.C.C. and the delivery of this wheat to the Cooperative warehouse, and the sale of it in the name of the Elmore Milling Company by Francis M. Elmore, was sufficient to justify the jury's verdict of guilty on count 32.

### Counts 1 to 11

■ These counts charge that the defendant engaged in certain illegal acts in violation of 15 U.S.C.A. § 714m(a) which were at variance with the emergency feed program set up in 1954 by the Government for the relief of livestock farmers who were injured by the drought of that year. For that purpose the C.C.C. undertook to dispose of surplus grain held by it to farmers without disturbing the market. Under the procedure, which is outlined above in describing the counts now under consideration, a farmer could obtain free of charge a Purchase Order enabling him to purchase a designated number of cwt. of grain, which must consist wholly of surplus feed grain comprising wheat, oats, barley or grain sorghums, or a mixture thereof with other feed. A mixture was required to contain not less than 75 per cent of eligible straight grains or not less than 60 per cent of eligible straight grains. The value of the Purchase Order was the number of cwt. called for by the order expressed in dollars; but if the 75 per cent or 60 per cent mixture was delivered the value of the order in dollars was 75 per cent or 60 per cent of the number of cwt. respectively. The farmer could use this order in the purchase of surplus or mixed grain from a dealer. When this was done the dealer was required to enter on the order the amount and character of the commodities delivered to the farmer, showing the number of cwt. of surplus straight grain and of mixed feed, and he and the farmer were required to sign and certify to the entries. The dealer in turn could deliver the certified order to the office issuing it and receive a negotiable dealer's certificate which expressed a dollar value based on the actual amount of *straight grain* delivered to the farmers as certified on the purchase order. The dealer's certificate was transferable at its face value and was accepted at this value for the purchase from the C.C.C. of available surplus feed commodities.

Evidence was offered as to each of the 11 counts and the jury found the defendant guilty on counts 1, 2, 6, 7, 9 and 11 and not guilty as to the rest. As to each of the 6 counts the Government produced a Farmer's Purchase Order issued in October, November or December 1954, upon which the defendant had certified that he had sold and delivered to the farmer the full amount of straight grain

wheat designated on the order. In no case did the purchase order show that the farmer did not receive the amount of straight grain called for by the purchase order but mixed grain of which straight grain formed only a part. Accordingly, the defendant was able to obtain dealer certificates ranging in value from $8.00 to $307.00, each of which was of greater value than that to which he was entitled. In each instance he negotiated the dealer's certificate and received the designated cash value. The evidence also shows that the defendant attended a conference at Columbia, South Carolina, on September 30, 1954, and received instructions as to the proper method of completing purchase orders. He also applied for and received a purchase order as a farmer for 61 cwt. of grain and used it to buy 101.75 cwt. of mixed feed containing 61 cwt. of straight grain. It is obvious that there was substantial evidence to support the convictions.

In general, the defense to counts 1 to 11 was that the Government's evidence was insufficient to prove that the farmers did not actually receive the amount of straight grain called for by the orders. The defendant testified that he was instructed by the Government officials that he could put the amount of straight grain called for by the certificates into a mixture of straight grain and mixed feed and that each of the farmers named in the first 11 counts got all the straight grain which his purchase order called for, mixed with other grain, and that the defendant did not show this fact on the purchase orders as he did not understand that it was necessary to do so. He therefore asserted that he did not actually defraud the Government and had no intention to do so. The conflict of evidence caused by this defense was submitted to the jury, who found against the defendant. No motion was made by the defendant for a directed verdict.

Affirmed.