UNPUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,
          *Plaintiff-Appellant,*

v.                                    No. 02-4317

DAVID J. LENERTZ,
          *Defendant-Appellee.*

Appeal from the United States District Court
for the District of South Carolina at Rock Hill.
Matthew J. Perry, Jr., Senior District Judge.
(CR-99-21)

Argued: February 28, 2003

Decided: May 16, 2003

Before WILLIAMS, GREGORY, and SHEDD, Circuit Judges.

---

Reversed and remanded by unpublished opinion. Judge Shedd wrote
the majority opinion, in which Judge Williams joined. Judge Gregory
wrote a dissenting opinion.

---

## COUNSEL

**ARGUED:** Eric William Ruschky, Assistant United States Attorney,
Columbia, South Carolina, for Appellant. James Paul Rogers, Colum-
bia, South Carolina, for Appellee.

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

---

**OPINION**

SHEDD, Circuit Judge:

After a jury found David J. Lenertz guilty of three counts of wire fraud involving the development of a resort in the Bahamas, the district court granted judgment of acquittal in favor of Lenertz. The government appeals. We reverse the judgment of acquittal by the district court and remand for reinstatement of the jury verdict and for entry of judgment against Lenertz.

I.

The family of Hubert Bowe, a Bahamian national, owned several hundred acres of land on the island of Exuma in the Bahamas. In the early 1990s, Bowe, a high school dropout, formed a corporation and began the process of attempting to attract potential investors to help him develop the property as a resort. He expected that the project would cost several hundred million dollars to complete. Bowe, who was living in Charlotte, North Carolina, at the time, became acquainted with William Tindall. Although a high school teacher with no experience in developing resorts, Tindall got involved in trying to promote the project. Tindall backed out of the project, however, after he was asked to invest $200,000 of his own money.

In January 1996, Tindall resumed working on the project with Bowe. He searched the internet looking for a reputable venture capitalist and found the website for Stokker-Alpine International LLC (Alpine), a Wyoming corporation founded by Lenertz. The website represented that Alpine "is emerging as a world leader in the international finance arena." J.A. 509. Alpine claimed that it had financed several projects, one of which Tindall noticed was similar in size to Bowe's Bahamas project. The website also stated that one of Alpine's main services was arranging and negotiating loan commitments with private and institutional investors for world-class resorts.

Tindall contacted Alpine via e-mail and completed the necessary forms to become an Alpine broker, thereby hoping to ensure that he would get a 1% placement fee for any funds for the Bahamas project arranged through Alpine. When Tindall did not get a response from Alpine, he faxed a letter in early March requesting a reply. The next day Mary Steinbacher, who is, and was at the time, Lenertz's former wife, wrote Tindall explaining that Lenertz was out of the country but could be reached by e-mail, which she provided to Tindall.

Tindall continued to provide additional information to Alpine concerning the project. In particular, he completed a five-page Funding Application Form provided by Alpine. Tindall represented that the first phase of the Bahamas project would cost $257 million. He also stated that the Bowe family had no money to fund the project but would instead invest the real property and would offer a significant percentage of the profits from the project to investors in return for investor financing.

On March 21st, Lenertz wrote Tindall, saying that he had recently been in London and had presented Tindall's application for funding to one of Alpine's largest investor groups. Eventually, Lenertz asked Tindall to provide him certain documents relating to the project. Lenertz represented that once he received this documentation "my underwriting staff will be in a better position to analyze the transaction." J.A. 63.

By early May, Lenertz and Tindall began making arrangements for Lenertz to travel to the Bahamas to inspect the property. Lenertz required that all his expenses be prepaid and that he receive a $10,000 inspection fee prior to traveling to the Bahamas. Lenertz also proposed that for an additional $10,000 fee Alpine would agree to represent Bowe rather than the investor on this project. Lenertz said that he would have his "legal staff" prepare the consulting agreement and would bring it with him to the site inspection in the Bahamas. J.A. 69.

Lenertz and Tindall scheduled the site inspection for early June. On May 22nd, Steinbacher, on behalf of Lenertz, faxed Tindall explaining that the site inspection would be cancelled if Lenertz's fees and expenses were not received in Lenertz's account by noon the next day.[1]

---

[1]At trial, Steinbacher testified that the signature on this fax was not hers.

Tindall, along with several others, had been trying to enlist other family members and acquaintances to invest start-up money for the project. On May 24th, Tindall finally obtained a commitment from a person in Texas to invest $10,000. That investor wired the money to Tindall, who then wired the $10,000 on the same day to Lenertz's account in Wyoming.

Lenertz met both Tindall and Bowe for the first time when Lenertz arrived in the Bahamas for the site inspection in early June. The evening before the inspection, Tindall and Lenertz met privately. Lenertz told Tindall that he had done numerous funding arrangements for resorts all around the world and that all of them were operating successfully. Lenertz also told Bowe that he had financed hotels all around the world, and that his company owned 182 resorts. During part of the next day, Tindall, Bowe, and Lenertz traveled to Exuma and viewed some of the Bowe family property.

One week later, after having seen only some of the property once and having obtained only minimal information about the project, Lenertz forwarded to Tindall a proposed contract to provide a $30 million funding commitment for the Bahamas project. In fact, Lenertz warranted that he already had an investor for the project.[2] Pursuant to the proposal, Lenertz would obtain $30 million in funding for the development. In return, Bowe would be required to pay Alpine $900,000 for obtaining the financing. Bowe would pay this fee in two installments. The first, a payment of $75,000, would be due when Alpine presented to and Bowe accepted the commitment to provide the funding. The second installment, a payment of $825,000, would be due when the $30 million was actually provided to Bowe to be used for the project. All fees were to be "considered fully earned, payable and completely non-refundable as and when paid." J.A. 506. Bowe accepted this proposal on June 20th.

Tindall and Lenertz arranged for a second meeting between Lenertz and Bowe to be held on July 5th in Charlotte. On June 25th, Tindall wired $11,760 to Lenertz's account in Wyoming to pay his travel expenses and consulting fee. After he received the additional money,

---

[2]Lenertz told the FBI that the investor was to be Bassam Farha, who was associated with the First Merchant Bank in Cyprus.

Lenertz wrote Tindall outlining what he expected to happen at the Charlotte meeting. Among other things, Bowe would bring $75,000 for the funding commitment, and Lenertz would bring the funding commitment to the meeting so that Bowe could examine it and decide whether to accept it. Tindall asked Lenertz to bring with him to the meeting evidence of other projects he had completed.

When the parties met in Charlotte on July 5th, Lenertz showed Bowe and Tindall a notebook filled with pictures of several other projects throughout the world that Lenertz claimed he had funded. At the meeting, Bowe did not make the first installment payment, and Lenertz, although he "flashed" the purported funding commitment in front of Bowe, would not allow Tindall or Bowe to review it.

Ten days after the Charlotte meeting, Tindall wrote Lenertz on behalf of Bowe requesting biographical information and a listing of other similar projects that Lenertz had completed. Lenertz never provided the requested information.

Soon thereafter, Bowe fired Tindall. Lenertz, however, continued working on the deal. He traveled to the Bahamas in the fall of 1996 and met with Bowe and his attorney. The attorney specifically asked to examine the financing commitment, but Lenertz refused to let him see it. The attorney accused Lenertz of being a cheat and told him to leave. Nevertheless, Lenertz thereafter telephoned Bowe directly a few more times trying to renegotiate the deal.

About a year later, Lenertz was interviewed by an FBI agent. The agent asked Lenertz to bring to the interview documents relating to his company in general and to the Bahamas project in particular. At the interview, Lenertz produced only 88 pages of documents. Lenertz said that he had very few documents relating to his business dealings since 1986. During the interview, Lenertz told the agent that he operated Alpine out of his house and that he had no employees. Thereafter, the government charged Lenertz with four counts of wire fraud relating to the Bahamas project.

In addition to the above evidence which is part of the record,[3] the

---

[3]The government's brief contains a significant amount of evidence which it proffered at trial but which the district court excluded. The court has not relied on any of the excluded evidence.

government adduced additional testimony from several other witnesses at trial. Of particular import was the testimony of Steinbacher and William Kerr, a national bank examiner from the office of the Comptroller of the Currency.

As stated above, Steinbacher is the former wife of Lenertz. They met in 1983 and married within two years. Lenertz was already working in the field of finance when they met. The couple moved to Wyoming in 1994, but they divorced a couple of months later. Nevertheless, by early 1996, Lenertz and Steinbacher were again living together in the same home, and Lenertz was using the home as his office. Steinbacher was named as an officer of Alpine, and she had authority to write checks for the company. She also helped make travel arrangements for Lenertz. Steinbacher was not aware that Alpine had any other employees. Also, she was not aware whether Lenertz had ever closed a deal during the 13 years that they were together.

Kerr, the bank examiner, testified that the financial data and project information for the Bahamas project that Lenertz had acquired was insufficient in several respects. For instance, there was no professional feasibility study and no appraisal of the land. No soil samples had even been taken to determine if the undeveloped land where the project would be constructed would support buildings. There was no information as to whether the Bahamian government would allow such a project. Also, the financing package lacked any basis upon which to determine basic projections for costs and revenues. The financing commitment was for $30 million, but it failed even to specify what the money would be used to build. Based on the clearly insufficient data that Lenertz had acquired relating to the Bahamas project, the bank examiner concluded that no lender would commit to funding a loan for the project.

At the close of all the evidence, the district court granted judgment of acquittal on Count 3. That count is not at issue in this appeal. After the jury returned a guilty verdict as to the three remaining counts, the defendant moved for judgment of acquittal on all three counts. Lenertz argued generally that there was insufficient evidence to support the jury's verdict. He argued in particular that there was no evidence that anyone relied on any misrepresentation by Lenertz. The

government failed to argue to the district court that reliance is not an element. Lenertz now concedes that reliance is not an element of the crime of wire fraud. After hearing arguments, the district court, from the bench, granted judgment of acquittal on the remaining three counts.

## II.

When reviewing a district court's post-verdict judgment of acquittal, we must sustain the jury's verdict if there is substantial evidence, viewed in the light most favorable to the government, to support it. *United States v. Steed*, 674 F.2d 284, 286 (4th Cir. 1982). In determining whether the evidence in the record is sufficient, we consider whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *See United States v. Lomax*, 293 F.3d 701, 705 (4th Cir. 2002). Also, in evaluating the evidence, we are not entitled to weigh the evidence or to assess the credibility of the witnesses, but rather we must assume that the jury resolved all contradictions in the testimony in favor of the government. *United States v. Romer*, 148 F.3d 359, 364 (4th Cir. 1998). A reviewing court, therefore, may not overturn a substantially supported verdict merely because it finds the verdict unpalatable or determines that another, reasonable verdict would be preferable. *United States v. Burgos*, 94 F.3d 849, 862 (4th Cir. 1996) (en banc).

Because the government alleged in the indictment that a misrepresentation was part of Lenertz's scheme, the elements of wire fraud,[4] as applied to the instant case, are: (1) the existence of a scheme to defraud that involved a material misrepresentation; and (2) the use of interstate wire communications to facilitate the scheme. *See Neder v. United States*, 527 U.S. 1 (1999); *United States v. ReBrook*, 58 F.3d

---

[4]18 U.S.C.A. § 1343 (West 1996) provides, in pertinent part:

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire . . . communication in interstate or foreign commerce, . . . for the purpose of executing such scheme or artifice, shall be fined . . . or imprisoned not more than five years . . . .

961, 966 (4th Cir. 1995). To establish the first element, the government must prove that the defendant acted with specific intent to defraud. *See* 18 U.S.C.A. § 1343; *United States v. Godwin*, 272 F.3d 659, 666 (4th Cir. 2001) (holding that proof of specific intent to defraud is required in the prosecution of the similar crime of mail fraud under § 1341). Fraudulent intent may be established by circumstantial evidence and by inferences deduced from facts and situations. *United States v. Bales*, 813 F.2d 1289, 1294 (4th Cir. 1987). Similarly, fraudulent intent may be inferred from the totality of the circumstances and need not be proven by direct evidence. *United States v. Ham*, 998 F.2d 1247, 1254 (4th Cir. 1993).

Lenertz does not dispute that there is substantial evidence establishing the three interstate wire transfers alleged in the three counts. Instead, Lenertz argues that the jury, as a matter of law, could not have inferred that his actions were part of a scheme to defraud.

There is ample evidence that Lenertz devised a scheme to defraud.[5] The jury could reasonably find that Lenertz's business strategy was driven by deception. All of his falsehoods[6] about the experience and capacity of Alpine were designed to make Bowe and his associates believe that Alpine could readily obtain funding for the project from his usual sources of funding. Instead, the evidence, when viewed in the light most favorable to the government, suggests that Lenertz had never completed a deal and, as such, never had usual sources of funding from which he could or would even attempt to obtain funding.

Also, there is ample evidence that Lenertz's scheme to defraud

---

[5]"To defraud" commonly refers to "wronging one in his property rights by dishonest methods or schemes." *Hammerschmidt v. United States*, 265 U.S. 182, 188 (1924).

[6]The government alleged three specific misrepresentations in the indictment. *See* discussion, page 8-9, *infra*. The government also produced evidence at trial of several other ancillary misrepresentations that Lenertz made regarding Alpine (*e.g.*, that Alpine had an underwriting staff and that it had successfully financed several other projects). The government was not required to allege these particular ancillary misrepresentations in the indictment. They were admissible, nevertheless, as circumstantial evidence of Lenertz's scheme to defraud.

involved at its very core a material misrepresentation. The material false-hood[7] alleged in all three counts is that Lenertz represented that he could arrange and negotiate a $30 million loan commitment to finance the development of the Bahamas project. This allegation is taken almost verbatim from the terms of the written proposal offered by Lenertz to Bowe. Lenertz promised that Alpine would negotiate for and "provide a formal Commitment for Financing" a $30 million loan for the Bahamas project. J.A. 502, 506.

Because the alleged material misrepresentation by Lenertz relates to future performance of a contractual obligation, the government must show beyond a reasonable doubt that Lenertz, at the time he indicated he could obtain funding for the Bahamas project, never intended to fulfill his promised performance. The government can meet this burden by showing that Lenertz, even though he could have possibly performed his obligation, never intended to perform it. *See Durland v. United States*, 161 U.S. 306, 313 (1896) (ruling that the similar mail fraud statute "includes everything designed to defraud by representations as to the past or present, or suggestions and promises as to the future."); *Elmore v. United States*, 267 F.2d 595, 603 (4th Cir. 1959) ("In practical effect, a false promise fraudulently given amounts to a false statement of an existing intent . . . .").

From the start of his relationship with Bowe and the others involved in developing the Bahamas project, Lenertz misrepresented several facts about his company. A reasonable jury could decide that they were all designed and consistent with a scheme which had as its main purpose to obtain advance fees from Bowe and his associates. The success of this scheme hinged on Lenertz making Bowe believe that he could and would obtain $30 million in funding for the project. The very structure of the contract proposal offered by Lenertz was entirely consistent with accomplishing this scheme. For instance, Lenertz demanded and was paid more than $20,000 in fees even before he was required to commit to obtaining a loan. Also, under the proposed contract, Lenertz would obtain an advance fee of $75,000 which would be payable for merely producing a funding commitment

---

[7]The government alleged two other misrepresentations in the indictment, but it now concedes that there is insufficient evidence to support a conviction as to those particular allegations.

letter from an investor indicating that $30 million would be committed to the project. Based on the expert testimony of the bank examiner, who concluded that no legitimate lender would commit funding to the Bahamas project based on the inadequate supporting materials obtained by Lenertz, a reasonable jury could decide that any such funding commitment letter produced by Lenertz would have been fraudulent.

Moreover, based on the totality of the circumstances, a reasonable jury could also find that Lenertz acted with fraudulent intent. Although there is no direct evidence that Lenertz intended to defraud Bowe and others interested in the project, no such direct evidence is required. Instead, the reasonable inferences deduced from the circumstantial evidence would allow a jury to find that Lenertz intended to defraud Bowe and others into paying him advance fees and that he never intended to attempt to obtain funding for the Bahamas project.

III.

In the instant case, we find that the jury could have found the essential elements of the crime of wire fraud beyond a reasonable doubt. There is sufficient evidence in the record to support a finding that Lenertz designed a scheme to defraud Bowe and others involving a material falsehood and used interstate wire communications to facilitate the scheme.

Therefore, we reverse the judgment of acquittal by the district court and we remand for reinstatement of the jury verdict and for entry of judgment against Lenertz.

*REVERSED AND REMANDED*

GREGORY, Circuit Judge, dissenting:

I cannot find substantial evidence in the record to support Lenertz's wire fraud conviction. For this reason, I would affirm the district court's decision to grant Lenertz's motion for judgement of acquittal.

The majority correctly notes that in order to convict Lenertz of wire fraud, the government must prove: (1) that the scheme to defraud

involves a material misrepresentation; and (2) that the defendant acted with fraudulent intent. *See Neder v. United States*, 527 U.S. 1, 25 (1999). In its indictment, the government alleged that Lenertz made three material misrepresentations in furtherance of his scheme to defraud Bowe and the other investors. However, on appeal, the government concedes that there was insufficient evidence in the record to prove that two of the representations were false and misleading. Thus, the government's appeal focuses solely on one statement made by Lenertz — that he could negotiate and arrange a $30 million loan commitment to finance the development of Bowe's resort project — which the government contends is a material misrepresentation.

To successfully prosecute this case, the government must prove that Lenertz's statement that he "could negotiate and arrange a $30 million loan commitment" was false at the time he made it. *See Elmore*, 267 F.2d at 603 (noting that "a false promise fraudulently given amounts to a false statement of an existing intent"). The government concedes, as the majority affirms, that there is no direct evidence in the record to prove that Lenertz knew this statement was false when he made it. The success of the government's case, therefore, depends entirely upon circumstantial evidence. *See Ham*, 998 F.2d at 1254 (explaining that fraudulent intent, for purposes of establishing a wire fraud conviction, may be proven with circumstantial evidence).

The majority relies upon the following circumstantial evidence to prove that, at the time he made the statement, Lenertz knew that he could not negotiate and arrange the loan commitment: (1) Lenertz's misrepresentation of several facts about his company; (2) Lenertz's contract with Bowe, which required Bowe to pay Lenertz certain consulting and advance fees before Lenertz actually secured the loan commitment; and (3) the testimony of a national bank examiner that, in his opinion, no legitimate lender would commit funding to the resort project based on the documents drafted by Lenertz. *Ante*, at 9-10. Based on this evidence, the majority concludes that "the jury could have found the essential elements of the crime of wire fraud beyond a reasonable doubt." *Ante*, at 10.

I dissent because no rational jury could have inferred the essential elements of the crime of wire fraud based on this circumstantial evi-

dence. Although the government need not "'exclude every reasonable hypothesis other than that of guilt,'" *United States v. Guadagna*, 183 F.3d 122, 130 (2d Cir. 1999) (quoting *Holland v. United States*, 348 U.S. 121, 139 (1954)), the summation of evidence must permit a conclusion of guilt beyond a reasonable doubt. *United States v. Burgos*, 94 F.3d 849, 858 (4th Cir. 1996); *United States v. Hughes*, 716 F.2d 234, 240 (4th Cir. 1983) (explaining that "the proper construction is to view the evidence together as a coordinated and interrelated whole"). The summation of evidence in this case, viewing it in the light most favorable to the government, does not prove beyond a reasonable doubt that Lenertz could *not* negotiate or arrange this deal. Failure to prove this factual element is alone dispositive of the government's case. Indeed, the evidence establishes only that Lenertz's ability to negotiate and arrange a deal of this magnitude was questionable — or perhaps that he was an incompetent broker. This incompetence may be sufficient to satisfy the burden of proof for civil liability, but it falls short of satisfying the heightened evidentiary standard necessary to support a criminal conviction for wire fraud. Because I find that the jury's verdict in this case "crosses the line from permissible inference to improper speculation," *United States v. Teffera*, 985 F.2d 1082, 1088 (D.C. Cir. 1993), I would uphold the district court's determination that the government failed to satisfy its burden of proof in this case.

This is a case where the alternate hypotheses consistent with innocence are sufficiently strong that they must be deemed to instill a reasonable doubt in the hypothetical reasonable juror. *Teffera*, 985 F.2d at 1088. For this reason, I would affirm the district court's decision on Lenertz's motion for judgment of acquittal. I therefore respectfully dissent.